CAMALIER & BUCKLEY–MADISON, INC.

v.

The MADISON HOTEL, INC., et al., Appellants.

No. 73–1523.

United States Court of Appeals, District of Columbia Circuit.

Argued April 16, 1974.

Decided May 22, 1975.

---

David G. Bress, Washington, D. C., with whom Philip L. Cohan was on the brief, for appellants.

Warren K. Kaplan, Washington, D. C., with whom Dorothy Sellers, Washington, D. C., was on the brief, for appellee.

Before ROBINSON and ROBB, Circuit Judges, and SOLOMON,* United States Senior District Judge for the District of Oregon.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The Madison Hotel, Inc. (Madison) and Marshall B. Coyne, its president, appeal from a judgment awarding damages to Camalier & Buckley-Madison, Inc. (Camalier) on account of Madison's termination of a lease into which it had entered with Camalier. The judgment rests upon a verdict directed by the trial judge on the issue of liability, and the amount of damages set by the jury following submission of that issue to it. Presented for review are questions of construction and operation of key provisions of the lease, and of the propriety of some of the instructions given the jury on damages. We find that the direction of the verdict was erroneous, and that the error fatally infected the verdict on damages also. Accordingly, we vacate the judgment and remand the case for a full retrial.

## I. THE FACTUAL BACKGROUND

By an instrument dated July 7, 1967, Madison leased to Camalier a portion of the main lobby of Madison's hotel building, together with furnishings and equipment, for use by Camalier as a gift shop and newsstand. The lease specified a term of five years from March 1, 1967, renewable at Camalier's option for an additional five-year period, and incorporated two other features which were to assume great importance in this litigation. Paragraph 21 authorized Madison to relocate the demised premises in similar-sized space on the main lobby floor of either the hotel building or Madison's adjacent office building on a sixty-day notice of intention by Madison and at its expense.[1] Paragraph 16 provided that in the event of nonperformance by Camalier of any obligation of the lease for a period of five days after written notice thereof by Madison, the latter could terminate the lease and reenter the premises on a five-day notice of its intention to do so.[2]

On February 3, 1971, Coyne telephonically informed Camalier's president that the shop would have to be moved from the hotel lobby and relocated in the lobby of the office building. Coyne then received an acknowledgment of Camalier's obligation to comply if Madison provided equivalent space. By May, 1971, the new location was ready for occupan-

1. Paragraph 21 provided:

The parties hereby agree that the Landlord shall have the right to relocate the demised premises to another location on the main lobby floor of the hotel building, or office building immediately adjacent thereto, provided, however, that the substituted area shall be similar in size to the premises herein demised, and further provided that Landlord shall give Tenant sixty (60) days notice of its intention thereof. Any and all costs incurred by such relocation shall be borne by the Landlord and rental payments shall abate during any period in which Tenant shall be unable to operate its business.

2. Paragraph 16 provided:

In case the Tenant shall fail to pay the rent herein provided for, when and as the same is due and payable, and such default shall continue for a period of five (5) days after written notice thereof shall be given to the Tenant by the Landlord; or in case the Tenant shall abandon the demised premises or shall fail to keep said premises open for business and observe the minimum hours of operation as hereinbefore provided or if the Tenant shall fail to comply with any other provision or condition or agreement of this Lease on its part to be kept and performed, and such default shall continue for a period of five (5) days after written notice thereof shall be given to the Tenant by the Landlord, then upon the happening of any such event the Landlord shall have the right and option to terminate this Lease on five (5) days notice of intention to do so, any other notice to quit being hereby expressly waived by the Tenant, and upon the giving of said notice, the term of this Lease shall cease and terminate at the expiration of said five (5) days period and from thenceforth it shall be lawful for the Landlord to re-enter into or upon the demised premises without or with legal process and repossess the same as of the former estate of the Landlord, and expel the Tenant and those claiming under and through it, and remove its effects without being deemed guilty of any manner of trespass and without prejudice to any remedies which might otherwise be used for arrears of rent or preceding breach of covenant; and said Tenant hereby agrees that no waiver of any breach of covenant herein contained shall be construed to waive or in any manner effect the covenants of this Lease.

cy but Camalier refused to accept it, asserting that the area was smaller than the original site and that the fixtures were inadequate for storage and display of its wares. Negotiations between the parties, over a period of several months ensuing, failed to achieve a mutually satisfactory adjustment of those objections.[3]

By letter dated June 1, 1971, Coyne confirmed the February 3 telephone conversation and referred to Paragraph 21 of the lease.[4] That letter was followed by another, dated June 23, in which Coyne, again citing Paragraph 21, indicated a desire to terminate the lease but

suggested renegotiation of a new lease clarifying their differences.[5] After a conference between Coyne and Camalier failed to achieve that goal,[6] Coyne, by letter dated August 4,[7] advised that "[s]ince Article Twenty-One of your lease gives me the absolute right to require you to relocate your business and since the sixty day notice period will expire August 23, 1971,[8] we shall expect you to complete your moving into the relocated space by the last mentioned date, failing which, we shall consider you in default and will take such further action as we deem appropriate to the circumstances."[9] Then followed another

---

3. Because Madison's letters to Camalier during this period have vital roles in this case, we set them forth in extenso.

4. The letter said:
 This is to confirm the telephone conversation that I had with you from the office of Ginsburg, Feldman and Bress approximately February 3, 1971, when we reviewed the change of location from your present area to the lobby of the Madison Office Building, all in accordance with Paragraph Twenty-First of an Agreement dated the 7th day of July, 1967.

5. That letter read:
 As you know I reviewed with you in February of this year the lease for premises situated in The Madison Hotel. At that time I informed you that I was taking advantage of Article Twenty-One of that lease to relocate the demised premises to another location on the Main Lobby floor of the Office Building and I gave you the required notice of my intention. Since that time I have incurred substantial costs in making the relocation. The substituted area is now fully equipped and available for use. On Tuesday of this week I visited it with your Counsel, Mr. Melrod.
 I also notified you by letter of June 4, 1971 that I also wished to take advantage of my rights under the lease to terminate it.
 I do not wish at this time to recite all of the problems that have arisen in connection with your obligations under the lease. I believe I have an absolute right to insist upon either termination or relocation. However, at the suggestion of my Counsel and in order to avoid any litigation, I believe our interests would be best served if we met immediately upon your return from your trip abroad and renegotiated a new lease that would clarify any differences of opinion that we might have. This letter is not understood as a waiver of any rights under the lease, any of which I may pursue. I am hopeful that we

can agree quickly upon the terms of a new lease to supercede [sic] the existing agreement. In this way, we can avoid all differences of opinion. Please let me know as soon as possible through either your office of [sic] your attorneys whether this procedure is satisfactory.

6. During the course of the negotiations, Coyne was handed a letter stating Camalier's intention to extend the lease for an additional five-year term pursuant to the renewal option conferred by the lease. The record indicates that there were subsequent meetings between representatives of the antagonists, without avail.

7. There was also a letter from Coyne to Camalier, dated August 2, which stated:
 As you know, I notified you five months ago that I planned to move the leased premises from The Madison Hotel to equivilent [sic] space in the Madison Office Building. Since then, I sought, unsuccessfully, to communicate with you for the purpose of arriving at a time when the move could take place. Failing that, I had no recourse but to exercise all of my rights under the Lease to cancel the tenancy, and I notified you to that effect.
 In order to minimize the damages which I have sustained I agreed to a meeting in the office of Mr. Melrod, attended by your counsel and my counsel in an effort to resolve all the differences. I have now waited one week since that meeting to learn from you what your plans might be.
 Under these circumstances, I have decided to exercise all of my rights under the lease and this letter is to notify you that any losses or damages which I might sustain will be your responsibility.

8. The basis for this statement was the letter of June 23. See note 5, *supra*.

9. In pertinent part the letter said:
 Under date of June 23, 1971, I wrote to you by Certified Mail, Return Receipt Re-

letter, dated September 3, in which Coyne stated that "on Tuesday, September 7th, I will close the space you occupy currently and I request that you remove all merchandise forthwith." [10] That missive brought the final episode near.

On the night of September 6–7, an employee of Madison broke off a key in the lock securing the shop in the hotel building. Madison's night manager informed a Camalier employee of the lock; the employee retained a locksmith, regained entry, and business was conducted on September 7 and 8. On the night of September 8–9, Madison had the lock on the shop door changed, and on the next morning Madison's night manager told Camalier's employee that Coyne had informed him that Camalier had broken the lease and was not to reopen for business. When the employee nonetheless attempted to do so, he was unable to open the door, and it was then that Camalier turned to courts.

The complaint which Camalier filed in the District Court alleged wrongful eviction, trespass and breach of contract, and sought damages from Madison and Coyne. At trial before a jury, the judge directed a verdict for Camalier on the question of liability, and the jury assessed compensatory and punitive damages in its favor. [11] Madison's motion for a new trial, or in the alternative for remittitur, was denied and this appeal followed.

## II. THE OPTION TO RELOCATE

Camalier's motion for direction of the verdict summoned attention to three notice provisions of the lease. The first was the sixty-day notice of intention specified in Paragraph 23 as a precondition to exercise of Madison's right to relocate Camalier's shop. [12] The second was the five-day notice of default, and the third the five-day notice of intention, which Paragraph 16 made prerequisite to termination of the lease and reentry by Madison upon the leased premises. [13] The trial judge ruled that as a matter of law Madison did not comply with the third provision, and that the omission to do so entitled Camalier to a judgment establishing Madison's liability on all three causes of action stated in the complaint. With that, the judge deemed it unnecessary to determine whether Madison observed the other two notice requirements.

In this court, the parties have debated the effects, upon the issues presented for review, of each of the three notice provisions. Since we disagree with the trial judge's ruling, it is essential that we con-

---

quested, notifying you that the relocated premises in the Madison Office Building for the operation of your business under the July 7, 1967 lease was fully equipped and available for use.

It is my understanding that notwithstanding the notice given to you, it is your intention not to make the relocating move.

Since Article Twenty-One of your lease gives me the absolute right to require you to relocate your business and since the sixty day notice period will expire August 23, 1971, we shall expect you to complete your moving into the relocated space by the last mentioned date, failing which, we shall consider you in default and will take such further action as we deem appropriate to the circumstances.

This letter supercedes [sic] and cancels my letter to you of August 2, 1971 . . . . .

**10.** The letter read:

As you know I have repeatedly notified you that I have chosen to exercise my rights

under the lease you hold with The Madison Hotel, Inc. to demand that you move to equivilent [sic] space in The Madison Office Building. We have held a conference on this and I have patiently waited for you to comply with the terms of the lease.

Now I have no alternative but to assume that you have chosen to abandon the lease. Therefore, on Tuesday, September 7th, I will close the space you occupy currently and I request that you remove all merchandise forthwith. The merchandise will be held there at your peril for a reasonable period of time. If you wish to discuss this and to make the arrangements for the removal of the merchandise, I will be available in my office for a week.

**11.** For convenience, subsequent references to "Madison" are frequently, though not invariably, intended to include Coyne as well.

**12.** See note 1, *supra.*

**13.** See note 2, *supra.*

sider them all.[14] In the interest of orderly analysis, we start with the one associated with Madison's attempts to relocate the premises leased to Camalier.[15] We then consider those related to Madison's bid to terminate the lease.[16]

Paragraph 21 conferred upon Madison "the right to relocate the demised premises to another location on the main lobby floor of the hotel building, or office building immediately adjacent thereto," upon satisfaction of three conditions.[17] One was "that the substituted area . . . be similar in size to the premises [originally] demised . . . ."[18] Another was that Madison give Camalier "sixty (60) days notice of its intention thereof."[19] Still another was that "[a]ny and all costs incurred by such re-

location . . . be borne by [Madison] and rental payments . . . abate during any period in which [Camalier] shall be unable to operate its business."[20] The last condition does not tender any question for decision on this appeal, but the other two very much do.

■ Camalier refused to move its business into the office building on grounds that the facility there offered was smaller in floor, storage and display areas.[21] Like Camalier, we think the lease fairly contemplated substantial comparability in these respects,[22] and we agree with Madison that the conflicting evidence introduced on these subjects raised substantial issues of fact for resolution by the jury if Paragraph 21 was otherwise properly invoked.[23] Our im-

**14.** An additional consideration is that Camalier argues that the directed verdict must be sustained if Madison failed to observe the requirements of either of the three provisions. *See, e. g.,* Laughlin v. Eicher, 79 U.S.App.D.C. 266, 269, 145 F.2d 700, 703 (1944), cert. denied, 325 U.S. 866, 65 S.Ct. 1403, 89 L.Ed. 1985 (1945); Jones v. District of Columbia, 123 A.2d 364, 365 (D.C.Mun.App.1965).

**15.** In this part of this opinion.

**16.** See Part III, *infra.*

**17.** See note 1, *supra.*

**18.** See note 1, *supra.*

**19.** See note 1, *supra.*

**20.** See note 1, *supra.*

**21.** Camalier's evidence tended to show that the floor footage was perhaps as much as 10% less; and that the display space was 51 square feet and the storage space 36 cubic feet as compared with 158.9 square feet and 73.4 cubic feet, respectively, at the original location, or something less than half. By Madison's computations, the combined display and storage areas, expressed in square footage, were 264 at the new location and 241 at the old. There was testimony that Camalier would have accepted the substituted site in the office building had the shelving been carried upward, but that Coyne refused Camalier's request therefor on the ground that "[i]t will ruin the looks of my office building."

**22.** The premises subject to the lease were described therein as a portion of the main lobby floor of the hotel designated on an attached drawing, "together with the store fixtures, equipment and furnishings provided and installed by [Madison]." Display and storage capacity were important because ¶ 1(E) of the

lease bound Camalier to "maintain in the demised premises a complete line of merchandise usually carried by the operator of a 'news stand and gift shop' in a first class downtown hotel, and at all times during the term hereof, [to] keep the premises reasonably stocked with merchandise. . . ."

That Madison bore the prime responsibility for display and storage facilities appears from other provisions of the lease. Paragraph 2(C) required Madison to furnish "[a] reasonable amount of storage space . . . in one of the four (4) garage levels of the [hotel] building, for storage purposes." Additionally, the lease denied Camalier an unqualified right to install fixtures of its choice for any purpose. Paragraph 6(A) empowered Camalier "to place or install in said leased premises such fixtures and equipment as it may deem desirable for the conduct of business therein," but *only* "subject to approval of [Madison]"; that paragraph specifically provided "that any fixtures or equipment installed by [Camalier] must first be approved by [Madison] in writing before the installation thereof." In other words, Camalier was powerless to duplicate, over objections by Madison, the display and storage facilities of the old location at the new location, even at Camalier's own expense. Very importantly, nothing in the lease indicates contemplation that substantially inferior premises could be thrust upon Camalier in the event of a substitution. Camalier could be assured of premises of the character for which it had bargained only if the ¶ 21 conditions "that the substituted area . . . be similar in size to the premises herein demised" meant similarity in the facilities for display and storage as well as in floor area.

**23.** See note 21, *supra.*

mediate concern, however, is whether the notice requirement of Paragraph 21 was met, for if not the relocation provision by its own terms never became operative.

The evidence demonstrated more than ample communication to Camalier of Madison's desire that the shop be moved from the one building to the other. As early as February 3, Coyne telephoned Camalier's president to tell him just that;[24] the message was repeated in Coyne's letters of June 1[25] and 23,[26] both of which made specific reference to Paragraph 21. Each of these communications was more than sixty days in advance of the date—September 7—on which Madison first sought to oust Camalier for noncompliance with Paragraph 21. What Madison had in mind— as distinguished from legal validity of the thought, in view of the substituted space and fixtures offered Camalier— was indisputably to invoke that provision.

█ It is contended, however, that these messages were ineffective because none unequivocally established a time for the relocation Madison wished. More particularly, the argument is that neither of the communications transmitted more than sixty days prior to September 7 designated a date from which the sixty-day period for relocation was to run, or a date on which the period was to expire, and that for that reason each was fatally defective. We cannot agree. Paragraph 21 required notice by Madison merely "of its intention" to relocate Camalier;[27] it did not call for notice specifying a day certain on or before which relocation was to take place.[28] The evident purpose of this notice provision was to inform the lessee of the lessor's plan in time to permit the lessee an opportunity to prepare to move. Any communication clearly informing Camalier of the action demanded would suffice, then, after a minimum period of sixty days for preparation and compliance was afforded.[29] We have said that Madison's communications between February 3 and June 23 imparted the necessary information.[30] We now add that at least by August 23[31] Madison was entitled to insist upon relocation of the shop if the new quarters met applicable specifications of the lease.

## III. THE OPTION TO TERMINATE

The lease into which Madison and Camalier entered generated more than a contractual status;[32] for both it created new interests in the leased realty.[33] It conferred upon Camalier an estate therein for a five-year term, and an option to prolong the estate for another five years, an option which Camalier eventually exercised.[34] Thus Camalier was endowed not only with the rights which the lease as a contract extended to it, but also with a form of ownership of the shop premises, at the original or a relocated site, for the aggregate term of the lease.[35] These were the interests which in time Madison sought to liquidate.

**24.** See text *supra* following note 2.

**25.** See note 4, *supra*.

**26.** See note 5, *supra*.

**27.** See note 1, *supra*.

**28.** We later discuss a situation wherein, for reasons peculiar to it, specification of a precise date for action is necessary. See text *infra* at notes 71–74, 81–85.

**29.** *Compare* Fulton Realty Co. v. Athanas, 44 A.2d 417, 419 (D.C.Mun.App.1945); Mason v. Curro, 41 A.2d 164, 165 (D.C.Mun.App.1945); Zumwalt v. Hargrave, 71 Cal.App.2d 415, 162 P.2d 957, 960 (1945).

**30.** See text *supra* at notes 24–26.

**31.** This is the date on which Madison believed the sixty-day notice period ended. See note 9, *supra*.

**32.** Fern v. Crandell, 79 Colo. 403, 246 P. 270, 271 (1926); Sagamore Corp. v. Willcutt, 120 Conn. 315, 180 A. 464, 465–466 (1935); Masser v. London Operating Co., 106 Fla. 474, 145 So. 72, 77 (1933); Shultz v. Ramey, 64 N.M. 366, 328 P.2d 937, 940 (1958).

**33.** Jacobsen v. Sweeney, 92 U.S.App.D.C. 93, 202 F.2d 461 (1953); Isquith v. Athanas, 33 A.2d 733, 734 (D.C.Mun.App.1943).

**34.** See note 6, *supra*.

**35.** *Compare* Beall v. Everson, 34 A.2d 41, 42 (D.C.Mun.App.1943); Coggins v. Gregorio, 97 F.2d 948, 950–951 (10th Cir. 1938); Walling v. Peavy-Wilson Lumber Co., 49 F.Supp. 846, 858 (W.D.La.1943).

■ Paragraph 16 conferred upon Madison the option to terminate the lease and reenter the leased premises "if [Camalier] shall fail to comply with any . . . provision . . . or agreement of this lease on its part to be kept and performed . . .." [36] Paragraph 21, pertaining to relocation, was of course a provision within the compass of Paragraph 16. But exercise of the option on account of any such failure was expressly conditioned upon rendition of two notices by Madison to Camalier. One was a written notice of default, after which the default would have to persist for five days before the option could be utilized.[37] The other was a five-day notice of intention to terminate the lease because of the default.[38] Paragraph 16 expressly provided that the term of the lease would cease upon the expiration of the five-day period following the second notice, and that thereupon Madison could reenter and repossess the leased premises.[39]

■ Thus Paragraph 16 of the lease erected a procedure for ending, at Madison's option, the lease arrangement upon the happening of specified contingencies.[40] Furthermore, one of the contingencies may have occurred—nonperformance of Camalier's duty to relocate its shop if the new site satisfied the conditions of the lease.[41] But even if

Camalier did default in that respect, it was incumbent upon Madison to observe the procedural prerequisites to dissolution of the parties' relationship on that account. Camalier's noncompliance with an obligation of the lease, while enabling suit for breach of contract,[42] did not alone authorize termination of its estate;[43] only the Paragraph 16 option offered that course.[44] That option could be asserted only on the terms it prescribed,[45] including the notice requirements it specified;[46] and unless and until the option was properly exercised, the lease and Camalier's estate thereunder remained unaffected.[47]

*Notice of Default*

Camalier could not possibly have defaulted in its obligation to relocate the shop prior to readiness of a new site for its occupancy, or prior to expiration of a sixty-day notice by Madison to relocate.[48] As we have stated, by early May there were new quarters in the office building for Camalier's shop, which at least in Madison's view were comparable to those in the hotel building;[49] and as we have held, there was notice to relocate considerably more than sixty days before Camalier's eviction actually took place.[50] And Coyne's letter of August 4 informed Camalier of Madison's "understanding that notwithstanding the notice [of relocation][51] given to you, it is not your

**36.** See note 1, *supra.*

**37.** See note 1, *supra.*

**38.** See note 1, *supra.*

**39.** See note 1, *supra.*

**40.** See note 1, *supra.*

**41.** See Part II, *supra.* Of course, we intimate no view in this regard.

**42.** See cases cited *supra* note 32.

**43.** *See* United States v. San Geronimo Dev. Co., 154 F.2d 78, 86 (1st Cir.), cert. denied, 329 U.S. 718, 67 S.Ct. 50, 91 L.Ed. 623 (1946); Hyde v. Bains, 247 Ala. 8, 22 So.2d 324, 325 (1945); Keller v. Model Coal Co., 142 W.Va. 597, 97 S.E.2d 337, 340 (1957).

**44.** See cases cited *supra* note 43.

**45.** *See* Gibson v. Lee Wilson & Co., 211 Ark. 300, 200 S.W.2d 497, 501–502 (1947); Associated Cotton Shops v. Evergreen Parking Shop-

ping Plaza, 27 Ill.App.2d 467, 170 N.E.2d 35, 37 (1960); Vincent v. Kaser Constr. Co., 255 Iowa 1141, 125 N.W.2d 608, 609 (1963); Stromquist v. Nelson, 159 Kan. 716, 158 P.2d 458, 461–462 (1945); Harris v. Ware, 93 S.W.2d 598, 600 (Tex.Civ.App.1936).

**46.** *See* Texas & N. O. R. R. v. Phillips, 196 F.2d 692, 694 (5th Cir. 1952); Lexington Arms, Inc. v. Henrich, 153 So.2d 31, 32 (Fla.App.1963); National Bank of South Carolina v. People's Grocery Co., 153 S.C. 118, 150 S.E. 478, 481 (1929).

**47.** *See* Jader v. Costello, 405 Ill. 181, 89 N.E.2d 814, 817 (1950). See also cases cited *supra* note 45.

**48.** See note 2, *supra.*

**49.** See text *supra* at note 3.

**50.** See Part II, *supra.*

**51.** See text *supra* at notes 24–26.

intention to make the relocating move," [52] and that

> Since Article Twenty-One of your lease gives me the absolute right to require you to relocate your business and since the sixty day notice period will expire August 23, 1971, we shall expect you to complete your moving into the relocated space by the last mentioned date, failing which, we shall consider you in default and will take such further action as we deem appropriate to the circumstances. [53]

■ We think that letter satisfied the requirement of notice of default which Paragraph 16 of the lease imposed. The letter was written after the parties were in dispute as to equivalence of the new shop site to the old, and after Camalier had manifested reluctance to relocate. The letter set forth unequivocably Madison's position that Camalier was under a duty to relocate its shop on or before August 23, when the sixty-day period of notice therefor expired, [54] and that failure to do so would be deemed a default. The plain purpose of the requirement of notice of default was to alert Camalier to the possibility of eviction unless it brought itself into compliance. That is precisely what the letter of August 4 did, [55] and we are unable to read into Paragraph 16 a responsibility on Madison's part to do more. [56] And Madison unquestionably waited for more than the necessary five days from August 23 before undertaking to oust Camalier from the location in the hotel.

*Notice to Terminate*

These conclusions leave Madison confronted, however, with the further need to show proper notice of its intention to terminate the lease—a notice conformable with Paragraph 16, including its explicit demand for a notice period of five days. [57] We are unable to discern from the record any notice of that character during the negotiations between the parties from June through August. Neither the letter of June 1 nor the letter of June 23 called upon Camalier to quit the premises; on the contrary, both recognized an on-going tenancy. [58] Likewise, the letter of August 4, which urged relocation by August 23, and admonished that "failing [that], we shall consider you in default and will take such further action as we deem appropriate to the circumstances," [59] clearly envisioned continuation of Camalier's tenancy if it would but relocate its shop. [60]

■■ It thus becomes pivotal to determine whether Madison's final communication to Camalier—Coyne's letter of September 3—gave the notice of termination which Paragraph 16 prescribed. The relevant part of the letter was the sentence in which Coyne stated that "on Tuesday, September 7th, I will close the space you occupy currently . . . .." [61] The letter was sent on September 3 by certified mail, and by the terms of the lease a notice so mailed was to be treated as given on the date of mailing; [62] but even counting September 3, the five-day period did not expire until September 8. By the rule now entrenched in

---

52. See note 9, *supra.*

53. See note 9, *supra.*

54. See note 8, *supra,* and accompanying text.

55. See text *supra* at note 53.

56. We see no difference, either in legal contemplation or in the intendment of ¶ 16, between a notice which, as here, unmistakably advises that a specified course of conduct will be considered a default on or after a date certain in the future, and a notice given after the claimed default has occurred. In each instance the notice serves the function which the notice requirement was designed to provide.

57. See note 2, *supra.*

58. See notes 4, 5, *supra.*

59. See note 9, *supra.*

60. See note 9, *supra.*

61. See note 10, *supra.*

62. Paragraph 23 of the lease provided that "[a]ll notices hereunder shall be deemed to have been duly given if mailed in any U.S. Post Office, enclosed in a certified or registered postpaid envelope addressed to the Landlord and Tenant, respectively, at" designated addresses.

the District of Columbia, the requirement of five days' notice meant notice over five full days,[63] which could be made out only by counting the whole of September 7.[64] Put another way, a five-day notice given on September 3, though counting that day, would not run its course until midnight of September 7–8.[65] Thus the key sentence of the September 3 letter—that "the space you occupy currently" could be "close[d]" "on Tuesday, September 7th"—undertook to designate a terminal date one day too early to satisfy the notice command of Paragraph 16.[66]

 That, however, does not end the matter, for there are other considerations bearing on the problem. Notwithstanding the erroneous terminal date specified in the notice, and despite the abortive attempt to lock Camalier out of the premises on the night of September 6–7,[67] Madison did not succeed in evicting Camalier until the morning of September 9,[68] well outside the five-day notice period. And Paragraph 16, after stating the requirement of a five-day notice, further provided that

> upon the giving of such notice, the term of this Lease shall cease and terminate at the expiration of said five (5) days period and from thenceforth it

shall be lawful for the Landlord to re-enter into or upon the demised premises without or with legal process and repossess the same as of the former estate of the Landlord, and expel the Tenant . . ..[69]

In sum, what this provision says is that the lease would terminate, and that Madison could dispossess Camalier, upon expiration of the five-day period following notice, which actually occurred before Camalier's eviction. Moreover, it is settled with us that a timely notice to terminate a tenancy need not specify the terminal date.[70] Madison thus has faced difficulty only because the notice designated September 7 as the terminal date, a blunder which the trial judge deemed sufficient to vitiate the notice entirely. In reviewing that ruling, we must decide whether Madison's otherwise valid notice of termination was rendered nugatory merely because it unnecessarily stated a terminal date earlier than the date on which the five-day notice would expire, or whether the notice was effective to terminate the lease on the day next following—the date on which it properly might have been terminated.

In Merritt v. Thompson,[71] a landlord served notice on July 1, 1922, ordering month-to-month tenants, whose terms began on the first day of each calendar

---

63. *See* Merritt v. Thompson, 53 App.D.C. 233, 234, 289 F. 631, 635 (1923); Miller v. United States, 77 A.2d 171, 172 (D.C.Mun.App.1950); Zoby v. Kosmadakes, 61 A.2d 618, 620 (D.C. Mun.App.1948); Klein v. Miles, 35 A.2d 243, 245 (D.C.Mun.App.1944). These cases dealt with a statutory notice requirement, but we see no basis for treating essentially similar party-made requirements differently.

64. In fixing a time when a lessor's notice of termination expires, the law does not take cognizance of fractions of a day. Young v. Baugh, 35 A.2d 242 (D.C.Mun.App.1944).

65. Merritt v. Thompson, *supra* note 63, 53 App.D.C. at 234, 289 F. at 635; Zoby v. Kosmadakes, *supra* note 63, 61 A.2d at 621; Young v. Baugh, *supra* note 64, 32 A.2d at 242.

66. Weaver v. Koester, 54 App.D.C. 80, 81, 294 F. 1011, 1012 (1924) (30-day period pursuant to notice served May 1 did not expire until June 1); Merritt v. Thompson, *supra* note 63,

53 App.D.C. at 234, 289 F. at 635 (notice served July 1 and made to expire on July 31 was not for the full 30-day period).

67. See text *supra* following note 10.

68. See text *supra* following note 10. To constitute an eviction, the lessee must be dispossessed or he must abandon the premises because of the lessor's conduct; there is no eviction where he remains in possession. Loining v. Kilgore, 232 Minn. 347, 45 N.W.2d 554, 555 (1951); Muehling v. Juvenile Shoe Corp., 8 S.W.2d 937 (Mo.App.1928); Liberal Savs. & Loan Ass'n v. Frankel Realty Co., 137 Ohio St. 489, 30 N.E.2d 1012, 1017 (1940).

69. See note 2, *supra*.

70. *See* Byrne v. Morrison, 25 App.D.C. 72, 75 (1905); Mason v. Curro, *supra* note 29, 41 A.2d at 165; Young v. Baugh, *supra* note 64, 35 A.2d at 243.

71. *Supra* note 63.

month, to vacate their apartments on the following July 31. By statute, the tenancies were terminable only by thirty days' notice expiring on the day of the month from which the tenancies commenced to run.[72] This court held that the notice did not comply with the statute, and consequently would not sustain actions for possession, because "[n]either the tenancy nor the 30 days expired until midnight on July 31st, while the notice was to vacate, remove from, and quit the apartments on that date."[73] During the course of the opinion, it was stated that "[w]hile [the landlord] was not required to specify in the notice the date of the termination of the lease, having done so, he was bound by that date."[74] On the surface, that statement might seem to support the argument that Madison was equally bound by the terminal date its notice specified, with the result that the notice, like the notice in *Merritt*, did not terminate Camalier's tenancy.

That such reasoning would be faulty plainly appears, however, from this court's subsequent decision in All States Service Station v. Standard Oil Company.[75] A motor fuel sales contract provided that it was terminable by the seller "at any time on giving Buyer ten (10) days' written notice of intention so to do."[76] By letter, the seller advised the buyer that it was exercising the right to terminate the contract, and stated that "such termination [was] to be effective ten days from the date of this letter."[77] This designation of effective date was deficient because the buyer did not receive the letter until the day after it was written and dated, and so the ten-day period from the letter's date did not afford the buyer ten full days from the

date of receipt.[78] It was held, nevertheless that "[t]he legal effect of the [seller's] letter . . . should be that the contract came to an end ten days after its receipt by the [buyer]."[79] The court elucidated:

> The legal effect of the [seller's] letter . . . should be that the contract came to an end ten days after its receipt by the [buyer]. By giving the letter this effect, the [buyer] received fully the protection to which it agreed, the period of notice is determined by the appropriate contract provision, and the [seller's] definite, meaningful act is not an empty gesture. To hold that the letter had no effect because it mistakenly set a period short of that required would make a modern application of the brittle fifteenth century common law. The rule which we adopt, that a notice, good in all other respects, such as being definite rather than a mere statement of future intention, is not made totally ineffective because it states a period shorter than the contract requires, is in accordance with the authorities.[80]

And the court explained away any antithetic which *Merritt* might superficially have indicated:

> [In that case], a monthly tenancy was involved. Inasmuch as the statute provided that the notice was to expire on the day of the month from which the tenancy ran . . ., the situation is quite different from h**·**re where the contract could cease at any time after ten days' notice.[81]

▮▮▮ It is clear enough that *All States* is the precedent for the case at bar. The

---

72. "A tenancy from month to month, or from quarter to quarter, may be terminated by a thirty days' notice in writing from the landlord to the tenant to quit, or by such a notice from the tenant to the landlord of his intention to quit, said notice to expire, in either case, on the day of the month from which such tenancy commenced to run. Act of Mar. 3, 1901, ch. 854, § 1219, 31 Stat. 1382, codified as D.C. Code § 45–902 (1973).

73. 53 App.D.C. at 234, 289 F. at 632.

74. *Id.*

75. 73 App.D.C. 342, 120 F.2d 714 (1941).

76. *Id.*

77. *Id.*

78. *See id.*

79. *Id.* at 343, 120 F.2d at 715.

80. *Id.* (footnote omitted).

81. *Id.* at 344 n.7, 120 F.2d at 716 n.7.

statutory limitation on terminating periodic tenancies which *Merritt* confronted—notice congruent with one of its units of duration [82]—has no application to the fixed-term tenancy involved here; [83] but for the exercise of some option of the lease enabling premature ending of Camalier's tenancy,[84] no notice to terminate would ever have been needed.[85] By the same token, the role of notice in this case, as in *All States*, was only what the parties gave it, and that was simply the mechanistic function of setting in motion a period at the expiration of which the parties' relationship would cease.[86] Like the contract in *All States*, the lease before us provided that after a designated time following notice, the relationship would end without more; [87] *All States* held that that result would not be affected by designation of an earlier terminal point in the notice, and we perceive no basis in precedent or logic to apply a different rule here.[88] We hold that the notice of termination which Madison gave Camalier, if in fact soundly premised on Camalier's refusal to relocate in similar quarters,[89] ended the lease and Camalier's contractual and property rights thereunder at midnight of September 7–8.[90]

The verdict on liability directed for Camalier is inconsistent with our analysis of the notice-to-terminate problem and the conclusion we reach upon the applicable law. The direction proceeded on the ground that the too-short notice period stripped the notice of all vitality, and thus rendered it incapable of terminating Camalier's tenancy at any point in time. The error pervading that theory necessitates a retrial of the issue of Madison's liability.

## IV. THE VERDICT ON DAMAGES

Madison additionally advances three separate challenges to the instructions which the trial judge gave to the jury on the question of the damages which it might assess in Camalier's favor. One impugns an instruction stating that profits which Camalier might have earned from its shop during the unexpired term of the lease following eviction comprised an element of damages which the jury could consider.[91] Another assails the denial of a requested instruction to the effect that Camalier was under a duty to mitigate the damages flowing from any unauthorized termination of the lease and the leasehold estate arising thereunder.[92] Still another

---

**82.** See note 72, *supra*.

**83.** "When real estate is leased for a certain term no notice to quit shall be necessary, but the landlord shall be entitled to the possession, without such notice, immediately upon the expiration of the term." D.C.Code § 45–901 (1973).

**84.** The lease contained other options to terminate which are not material here.

**85.** See note 83, *supra*.

**86.** See note 2, *supra*.

**87.** See note 2, *supra*.

**88.** Other courts have long subscribed to the view that a notice of termination specifying a time period shorter than that stipulated in the parties' agreement becomes effective upon expiration of the full period. *E.g.*, Lyon v. Pollard, 87 U.S. (20 Wall.) 403, 407, 22 L.Ed. 361, 362 (1874); Seaboard Mut. Cas. Co. v. Profit, 108 F.2d 597, 598–599, 126 A.L.R. 1105 (4th Cir. 1940). The same conclusion has been reached where the question was termination of rights conferred by a lease. *E.g.*, Medical Professional Bldg. Corp. v. Ferrell, 131 S.W.2d

683, 685 (Tex.Civ.App.1939). See Annots., 35 A.L.R. 893 (1925); 126 A.L.R. 1110 (1940).

**89.** See Part II, *supra*.

**90.** See note 65, *supra*, and accompanying text.

**91.** Each of Madison's several objections to this instruction stems from the fact that the judge did not also submit to the jury the question whether Camalier had itself violated the lease by failing to relocate the shop in the office building. The central theme of Madison's argument is that even if Madison broke the contract and wrongfully evicted Camalier, any injury to its possessory rights must be measured and limited by the consideration that it was entitled to remain on the premises only for five days after rendition of a notice of termination. See text *supra* at notes 75–90. Another theme is that the directed verdict on liability may have led the jury to believe that Camalier had been exonerated of the charge that it unjustifiably refused to relocate.

**92.** We have no doubt that a lessee wrongfully evicted generally has a duty to make reasonable efforts to minimize his losses. *See* An-

contests the judge's action in permitting the jury to include in its verdict a sum representing punitive damages.[93] We do not rest the fate of the verdict on damages upon the validity of these claims, for we find that in any event the case must be retried as to damages as well as to liability.

To be sure, in suitable circumstances the scope of a new trial may be limited to less than all of the issues raised in the case.[94] That course is appropriate where error requires a new trial on some issues but leaves the verdict on completely separate issues unin-

drews & Knowles Produce Co. v. Currin, 243 N.C. 131, 90 S.E.2d 228, 231 (1955); Thomas v. Callaway, 251 S.W.2d 921, 926 (Tex.Civ. App.1952). But mitigation of damages is "other matter constituting an avoidance or affirmative defense," and as such is to be affirmatively pleaded. Fed.R.Civ.P. 8(c); Associated Stations, Inc. v. Cedars Realty & Dev. Corp., 454 F.2d 184, 188 n. 5 (4th Cir. 1972) (applying Virginia law); 5 C. Wright & A. Miller, Federal Practice § 1273 (1969). See generally Annots., 75 A.L.R.2d 473 (1961); 41 A.L.R.2d 955 (1955), and failure to plead an affirmative defense generally waives the defense. Roe v. Sears, Roebuck & Co., 132 F.2d 829, 832 (7th Cir. 1943); Lopez v. U. S. Fidelity & Guar. Co., 15 Alaska 633, 18 F.R.D. 59, 61–62 (D.Alas. 1955); Bernard v. U. S. Aircoach, 117 F.Supp. 134, 137–138 (S.D.Cal.1953). Camalier contends that Madison did not observe the first of these rules and is now ensnared by the second.

Camalier also points out that neither party introduced any evidence to show whether it attempted to relocate its shop in similar space outside the hotel building, or to show how expectably it would have fared financially had it been successful in doing so. There was, of course, the new shop site in the office building, but its equivalence to the original site has not yet been determined, and an injured party is at liberty to reject an alternative dissimilar to the original. Bottorff v. Ault, 374 F.2d 832, 835 (7th Cir. 1967); Green v. Kaynar Mfg. Co., 369 F.2d 375, 376 (9th Cir. 1966); Williams v. Robinson, 158 Ark. 327, 250 S.W. 14, 15, 28 A.L.R. 734 (1923); Hussey v. Holloway, 217 Mass. 100, 104 N.E. 471, 472 (1914); Torson Constr. Co. v. Grant, 251 Ky. 800, 66 S.W.2d 79, 82 (1933); Holloway v. Levin, 107 Vt. 396, 180 A. 889, 890 (1935). The burden of proving circumstances giving rise to the duty to mitigate rests upon him who asserts it, Brewer v. Drain, 192 A.2d 532, 534 (D.C.App.1963); Brooks v. Capital Fleets, Inc., 123 A.2d 916, 917 (D.C.Mun.App.1956); Associated Stations, Inc. v. Cedars Realty & Dev. Corp., supra note 92, 454 F.2d at 188 n. 5 (applying Virginia law); Stark v. Shell Oil Co., 450 F.2d 994, 998 (5th Cir. 1971); Jackson v. Wheatley School Dist. No. 28, 464 F.2d 411, 413 (8th Cir. 1972), and instructions not supported by the evidence are properly refused. H. R. H. Constr. Corp. v. Conroy, 134 U.S.App.D.C. 7, 10, 411 F.2d 722, 725 (1965); W. B. Moses & Sons v. Lockwood, 54 App.D.C. 115, 117–118, 295 F. 936,

938–939, 33 A.L.R. 1467 (1924); West Disinfecting Co. v. Plummer, 44 App.D.C. 345, 355 (1916).

**93.** Madison invokes the familiar principle that punitive damages ordinarily are not recoverable for breach of contract alone, Brown v. Coates, 102 U.S.App.D.C. 300, 303–304, 253 F.2d 36, 39–40, 67 A.L.R.2d 943 (1958); Minick v. Associated Inv. Co., 71 App.D.C. 367, 368, 110 F.2d 267, 268 (1940); McIntosh v. Aetna Life Ins. Co., 268 A.2d 518, 521 (D.C.App. 1970); Den v. Den, 222 A.2d 647, 648 (D.C. App.1966), and embellishes it with the suggestion that the activities by which Madison regained possession of the leased premises were inextricably connected with the alleged breach of contract. We note initially that the instruction attacked was authored and requested by Madison's trial counsel (not his counsel on appeal), with the result that Madison is hardly in position to complain. Fed.R.Civ.P. 51; Imperial Ins., Inc. v. Employers' Liab. Assurance Corp., 143 U.S.App.D.C. 173, 177, 442 F.2d 1197, 1201 (1970); Koninklijke Luchtvaart Maatschappij N.V. KLM Royal Dutch Airlines Holland v. Tuller, 110 U.S.App.D.C. 282, 292, 292 F.2d 775, 785, cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961); Boyle v. Bond, 88 U.S.App.D.C. 178, 179, 187 F.2d 362, 363 (1951); Feltman v. Norris, 84 U.S.App. D.C. 295, 172 F.2d 289 (1949). More fundamentally, Madison's argument ignores trespass and wrongful eviction as additional causes of action, see Part I, supra—torts for which punitive damages may be allowed. Yopp v. Johnson, 51 Ga.App. 925, 181 S.E. 596, 597 (1935); Waller v. Cockfield, 111 La. 595, 35 So. 778, 780 (1904); Larose v. Berman, 123 Me. 187, 122 A. 433, 434–435 (1923); Minnich v. Kauffman, 265 Pa. 321, 108 A. 597, 598 (1919). There was evidence upon which the jury could properly have based such an allowance—one item, but not the only one, was the dark-of-night lock-changing method of eviction pursued by Madison when it knew that Camalier still claimed a right to possession, instead of invocation of the processes of the law for that purpose.

**94.** "A new trial may be granted to all or any of the parties and on all or part of the issues . . . ." Fed.R.Civ.P. 59(a). See also 28 U.S.C. § 2106 (1970). This power inheres in appellate as well as trial courts. Furr v. Herzmark, 92 U.S.App.D.C. 350, 354, 206 F.2d 468,

fected.[95] However, as the Supreme Court has cautioned, the power to grant a partial new trial "may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice."[96] And so, as the Court has held, where "the question of damages . . . is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, [a separation] would amount to a denial of a fair trial."[97] That is the situation confronting us here.

Having ruled favorably to Camalier on its motion for a directed verdict, the trial judge instructed the jury that "the issue of liability has been decided by the Court as a matter of law in favor of [Camalier]," and that this meant "that . . . [Madison's] conduct breached [Camalier's] rights . . . since [Madison] failed to give an adequate five-day termination notice." "[T]herefore," the judge continued, "[Madison's] conduct constitutes a trespass, a wrongful eviction, and breach of contract." The judge then informed the jury that "[a]ccordingly . . . there is no need for you to consider the other questions which have been raised concerning liability, such as whether the substituted space . . . was similar in size to the original space; [or] whether [Madison] ever gave an adequate or proper 60-day notice of relocation."

We think these instructions, albeit inadvertently, may have so distorted the postural image of the litigation in the jury's mind that its verdict cannot safely be accepted as a proper award of damages should Camalier prevail on retrial of the issue of liability. The unelucidated statement that Madison's "conduct breached [Camalier's] rights" may well have led the jury to erroneously believe that the dispute over relocation of Camalier's shop had been legally resolved against Madison, and that Camalier was inexorably entitled to remain in its quarters in the hotel building;[98] and that false notion, in turn, could have impermissibly influenced the jury's award of damages. It could have aggravated the amount which the verdict included for lost profits;[99] it could have settled for the jury Camalier's bona fides in renewing the lease for a second five-year term;[100] it could have dictated the jury's

472 (1953); Atkinson v. Dixie Greyhound Lines, 143 F.2d 477, 479 (5th Cir.), cert. denied, 323 U.S. 758, 65 S.Ct. 92, 89 L.Ed. 607 (1944); Thompson v. Camp, 167 F.2d 733, 734 (6th Cir.), cert. denied, 335 U.S. 824, 69 S.Ct. 48, 83 L.Ed. 378 (1948); Brown v. Richard H. Wacholz, Inc., 467 F.2d 18, 21 (10th Cir. 1972).

95. *See* Ecker v. Potts, 72 App.D.C. 174, 175, 112 F.2d 581, 582 (1940); Mason v. Mathiasen Tanker Indus., 298 F.2d 28, 32–33 (4th Cir.), cert. denied, 371 U.S. 828, 83 S.Ct. 23, 9 L.Ed. 66 (1962); Indamer Corp. v. Crandon, 217 F.2d 391, 394 (5th Cir. 1954); Devine v. Patteson, 242 F.2d 828, 832–833 (6th Cir.), cert. denied, 355 U.S. 821, 78 S.Ct. 27, 2 L.Ed.2d 36 (1957); Dazenko v. James Hunter Mach. Co., 393 F.2d 287, 291 n.7 (7th Cir. 1968); Lowery v. Clouse, 348 F.2d 252, 256 (8th Cir. 1965).

96. Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188, 1191 (1931). See also cases cited *infra* note 103.

97. *Id.,* 51 S.Ct. at 515, 75 L.Ed. at 1191. See also cases cited *infra* note 103.

98. The statement informed the jury in essence that because Madison had breached the lease by failing to give a proper notice of termination, it was irrelevant whether Camalier had also dishonored the lease by failing to relocate its shop in the substituted space Madison had provided in the office building.

99. See note 91, *supra.* Camalier was entitled to lost profits for the balance of the lease term only if the jury properly concluded that it was entitled to possession for that period, a matter which the jury could not determine without deciding the very thing the trial judge had previously instructed the jury not to consider— whether Camalier had itself broken the lease by unjustifiably refusing to relocate.

100. On this aspect of the litigation, the trial judge instructed the jury that it should decide whether Camalier's purported renewal of the lease, see note 6, *supra,* was made in good faith—"whether at the time such notice was given by [Camalier] to [Madison], the defendant [*sic*] had determined not to comply with [Madison's] previously given notice to require [Camalier] to move his stand to the substitut-

conclusion on mitigation of damages,[101] and as well on punitive damages.[102] In calling attention to the more conspicuous probabilities of prejudice, we do not suggest that the list is exhaustive.

■ Whether these or other possible consequences actually followed the handling of the matter is something we will never know. It is enough, however, that one or more may have; and viewing the situation realistically, we cannot confidently say that none did. In other words, we lack reasonable assurance that Madison did not suffer injustice through misapprehension of the jury as to something material to the verdict. Our duty, then, is to afford Madison a new trial on damages as well as liability.[103]

## V. CONCLUSION

■ In brief summary, the direction of the verdict on liability was erroneous.[104] There must be a new trial, by a jury unless waived, for the purpose of resolving the question whether the quarters which Madison offered Camalier in the office building were spacially similar to those which it had in the hotel lobby.[105] If the jury answers that question in the negative, it will then proceed to reassess Camalier's damages on the whole of its case.[106] If, on the other hand, the question is answered in the affirmative, the jury will proceed to establish the amount of the damages flowing only from any trespass on the night of September 6–7 which it may find,[107] and a new judgment in Camalier's favor for the amount thereof will then be entered.[108]

So ordered.

---

ed space then provided in the lobby of the adjoining office building." If the jury was left with the erroneous impression that Camalier was entitled to retain its location in the hotel lobby, it may the more easily have concluded that Camalier's renewal notice was made in good faith, particularly since the case as tried to the jury turned heavily on whether Madison had tendered similar space in connection with its relocation demand.

**101.** See note 92, *supra*.

**102.** See note 93, *supra*.

**103.** *See* Gasoline Prods. Co. v. Champlin Ref. Co., *supra* note 96, 283 U.S. at 500, 51 S.Ct. at 515, 75 L.Ed. at 1191, quoted in text *supra* at notes 96–97; Washington Gas-Light Co. v. Lansden, 172 U.S. 534, 555–556, 19 S.Ct. 296, 304, 43 L.Ed. 543, 551–552 (1899); Geffen v. Winer, 100 U.S.App.D.C. 286, 287, 244 F.2d 375, 376 (1957); Rivera v. Farrell Lines, Inc., 474 F.2d 255, 259 (2d Cir.), cert. denied, 414 U.S. 822, 94 S.Ct. 122, 38 L.Ed.2d 55 (1973); O'Neill v. United States, 411 F.2d 139, 146 (3d Cir. 1969); Atlantic Coast Line R.R. v. Bennett, 251 F.2d 934, 938–939 (4th Cir. 1958); Hatfield v. Seaboard Airline R.R., 396 F.2d 721, 724 (5th Cir. 1968).

**104.** See Part III, *supra*.

**105.** See Part II, *supra*. Because the case must be retried, we pass over two additional contentions urged. One stems from a ruling by the trial judge excluding the testimony of a witness for Madison and Coyne. Their trial counsel did not include the witness on his list of pretrial witnesses and did not proffer what the witness was expected to testify to. These problems can be avoided on retrial if the testimony of the witness is still desired. The other contention is that Coyne was not a party to the lease between Madison and Camalier, and for that reason could not properly be held liable for breach of contract. We perceive no barrier, however, to Coyne's liability on the counts of trespass and wrongful eviction if warranted by the evidence, and we note that there was testimony that Coyne instructed Madison's employees to lock Camalier out of the shop. In any event, we leave the ruling as is pending the outcome of the new trial.

**106.** See Part IV, *supra*.

**107.** Since the evidence shows that Camalier managed to restore the lock to working order and to reopen for business on September 7 and 8, an award of compensatory damages for this incident would be limited to the expense of putting the lock back into working order and any loss from delay in reopening on the 7th. See note 68, *supra*.

**108.** In that event, an award of punitive damages may be considered; with us, punitive damages may be recovered although compensatory damages are denied. Wardman-Justice Motors v. Petrie, 59 App.D.C. 262, 265–266, 39 F.2d 512, 515–516, 69 A.L.R. 648 (1930); Nader v. Allegheny Airlines, 365 F.Supp. 128, 133 (D.D.C.1973); First Nat'l Realty Co. v. Weathers, 154 A.2d 548, 550 (D.C.Mun.App.1959). But punitive damages for trespass would have to rest on the events of the night of September 6–7 only.