MORRIS SPACKMAN AND VERONICA SPACKMAN, PLAIN-
TIFFS AND RESPONDENTS, v. RALPH M. PARSONS COM-
PANY, A CORPORATION, DEFENDANT AND APPELLANT.
No. 10924.
Submitted April 4, 1966.   Decided June 2, 1966.
Rehearing denied June 20, 1966.
414 P.2d 918.

Alf C. Kremer, Lewis F. Rotering, Rex F. Henningsen (argued), Butte, for appellant.

Robert Holland, David L. Holland (argued), Butte for respondents.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an appeal by defendant, Ralph M. Parsons Company, (hereafter called Parsons) from a verdict and judgment for damages in the sum of $29,825.00, rendered in the district court of Silver Bow County in favor of plaintiffs.

The case involves damages to real and personal property caused by sewage flooding and exemplary damages in relation thereto.

During late April 1963, defendant Parsons was engaged in constructing a water line from Anaconda to Butte in connection with a new concentrator being built by the Anaconda Company.

The progress of the ditch digging reached a point behind the plaintiffs' motel, located at Montana and Front Streets in Butte, about April 25th.

On April 26th or 27th (the date is in conflict and will be discussed later) a machine called a "backhoe" bit into the earth and tore out four feet of the top half of a 24-inch sanitary sewer pipe line. Three men were present. One began digging

with a hand shovel to clear the dirt and debris away from the pipe openings, thereby encouraging the water to flow freely. A short time later, the backhoe tore out a similar four-foot section of an 18-inch sanitary sewer line.

The earth through which the ditch was being dug was a fill of decomposed granite—crumbly and given to caving-in. The sewage water worked swiftly on this type of soil and almost immediately caused the banks of the ditch to cave. The workmen did two things: first they built a small, 4-foot high earthen retaining dam across the ditch to prevent the water from flowing down the ditch. Then, with the use of the backhoe, they sloped the sides of the ditch away from the severed pipe inlets and outlets at an angle they considered sufficient to prevent further caving (1½ to 1). These efforts resulted in a widening of the ditch—originally 4 feet wide—to about 40 feet at the top and 12 feet at the bottom. The ditch was 16 feet deep. When about 4 feet of unbroken pipe was exposed, the men decided enough precautions had been taken. When they left the ditch for the weekend at 4:30, quitting time, the water was gushing out of the inlet, flowing across four feet of open dirt and broken pipe tile, entering the intended outlet and continuing its invisible journey. At the time, no one considered it necessary, if they thought of it, to notify the Butte Sanitation Division which had jurisdiction over the sewer lines and was responsible for maintenance thereof. No watchman or guard was placed at the ditch. By Sunday evening, the situation had changed drastically. Dirt and rock had caved into the ditch and plugged the outlets for the sewage. The ditch rapidly filled up. Seeking its own level, the water reversed its direction in the sewer pipes and flowed back toward its sources. On its way it sought out the plaintiffs' sink and floor drains and escaped through them into the plaintiffs' basement. Mr. Spackman discovered 2 to 3 inches of water in his basement about 6 o'clock Sunday evening.

A long series of frantic telephone calls followed which even-

tually succeeded in reaching several of the defendant's employees. The first employee, Mr. Nuckols, reached the motel between 7:00 and 8:00 p. m. The plaintiff's attorney reached the motel between 8:00 p. m. and 8:30 p. m. He called a photographer who began taking pictures of the flooding basement about 9:30. These are in evidence. The plaintiff's son-in-law arrived and took more pictures about 10:00. These also are in evidence. Shortly thereafter, more of the defendant's employees arrived with a small pump and began pumping out the basement. Other men worked on the ditch, extending it and pumping it out in an effort to lower the level of the water in the ditch. The water crested at 19½ inches before the pumps took effect. The basement was fully drained by Monday morning and the defendant sent in a crew of five or six men to remove the damaged property and clean the basement. It took them about two days to remove the items and scour the basement thoroughly. The motel was closed for those two days. The Butte Health Officer was called in to inspect the items removed from the basement and he ordered the greater portion of them destroyed.

The amended complaint prayed for the following damages:

1. $ 9,671.51—damage to personal property
       355.25—laundry expenses
        36.00—fumigation expenses
       252.00—loss of motel business for 2 days

   $10,314.76

2. $   825.00—Cost of replacing damaged basement floor

3. $25,000.00—exemplary damages

4. Costs of suit

The defendant confessed negligence in the severing of the sewer pipe lines and admitted liability for the laundry, fumigation and loss of business damages—a total of $646.25—and denied all the other alleged damages.

The jury returned a verdict for the plaintiffs on the first

claim in the amount of $9,000; on the second claim in the amount of $825; and on the third claim in the amount of $20,000.

The defendant's brief is extremely lengthy. The arguments and specifications of error can be grouped generally as: (1) whether plaintiffs breached their duty to mitigate the damages; (2) whether exemplary damages are proper in this case, and; (3) whether the actual damages and exemplary damages are excessive.

The duty to reduce or mitigate damages is a positive one upon the injured person, but it has limits. The test is: What would an ordinarily prudent person be expected to do if capable, under the circumstances? See generally 25 C.J.S., Damages, § 33, p. 701. The defendant claims the plaintiffs were obliged to wade into the sewage water and either remove the property from the basement or place it on shelves above the reach of the rising water. The contention is rather absurd since we are not dealing with drinking water, we are concerned with raw human sewage. It is beyond reason to say that a man and a woman have the duty to wade into such filth. Not only would such an act violate normal sensitivities, it would constitute a positive danger to one's health. The duty to mitigate damage occurring to one's property does not demand that a person place his health in jeopardy. In this case, where the property in the basement was largely of the type immediately contaminated by the mere presence of the sewage—linens, paper, bedding and other absorbent materials—regardless of whether it actually soaked in the water, it seems especially fruitless to say that the duty to mitigate demanded its removal. Most of it was contaminated before the plaintiffs discovered the flood. It must be remembered that the plaintiffs had no boots at the time the invading water was discovered, and did not obtain boots until about 10:00, four hours later, by which time the water had almost crested. Whatever damage was done had already been done by that time.

The defendant stresses the point that Mr. Nuckols attempted to remove a television set from the basement and was ordered by Mrs. Spackman to leave it alone. The testimony is conflicting about Mr. Nuckols' attempt to remove the set, but in any event there is no evidence that he either offered to or was prevented from removing anything else from the basement. The same applies to any of the more than a dozen other men present at one time or another that night. And certainly there was no duty upon the plaintiffs to ask others to subject themselves to the dangerous indignities of the situation. The fact is that it took six men armed with protective rubber boots, gloves, coats and headgear two days to remove the property and clean the basement. Such clothing was essential for reasons of health.

■■ As for the issue of compensatory damages, the question is always a difficult one. In tort actions, the wrongdoer is liable, in general, for any injury which is the natural and probable consequence of the wrong. These may include both the direct and indirect, but reasonably probable, results of the wrong. Where damage to property is concerned, the purpose of awarding damages is to return the party injured to the same, or as nearly possible the same, condition as he enjoyed before the injury to his property. The injured party is to be made as nearly whole as possible—but not to realize a profit. Compensatory damages are designed to compensate the injured party for actual loss or injury—no more, no less.

R.C.M.1947, § 17-401, states:

"For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

Ingenious men have propounded ingenious methods, systems and formulas for determining in monetary terms the value of property partially damaged or destroyed. While such methods serve as useful guides, the final answer rests in good sense rather than mechanical application of such formulas.

■ One such formula is that of market value—the market value of the property destroyed at the place of destruction immediately before its destruction—and we will adopt that measure as a guide to common sense. .

■■ Another guide or measure concerns property damaged but not totally destroyed, in which case the generally accepted estimate of damages is the difference in market value at the place before and after injury. But if repair is possible, and this cost is less than the diminution in value under the general test, this cost plus the value of the loss of use may be employed as the measure. In either case, the recovery ordinarily may not exceed the value of the property just before it was damaged. See generally Damages to Persons and Property, Oleck, 1961 Ed., § 202, p. 363.

The above principles guide us toward good judgment and fair compensation.

The statute which properly sets the scope of compensatory damages to be paid to the plaintiffs in this case is R.C.M.1947, § 17-401, supra. In other words, if some detriment was suffered by the loss of used or second hand property, the plaintiffs are not entitled to compensation on the basis of similar property in a brand new condition.

Mr. Spackman claims that he stood by the outside basement door Monday and Tuesday while the workmen carried the supplies and equipment out of the basement. He compiled with considerable detail a list of the items carried out—including such things as sand paper—98¢; paint roller cover—80¢. The "list" contains 160 items. We view it with some skepticism.

In determining the worth of these items, Mr. Spackman placed opposite each item the original cost of the item when purchased—or in a new condition. But at the trial it was revealed that at least 46 items on the list were in fact not new. They were either used or mixed in groups of new and used items of a kind. Mr. Spackman's evaluation of the items on the list comes to a total of $6,240.61. Rough calculations by this

court show that more than $2,600 of this amount relates to used articles. We must admit, however, that it is indeed difficult to determine the market value of some used items—such as the market value of a used paint roller cover. When carried to such extremes, the situation become ludicrous.

As concerns the items on this list, it is not shown to our satisfaction in the record that all of it was ordered destroyed by the Butte Health officer. As further concerns this list, the pictures in evidence raise some doubt in our minds as to the credibility of Mr. Spackman's statement from the witness stand that everything on that list was "submerged in the sewage, yes, sir."

We find the valuation of that property totally improper and beyond usual test-measures and common sense.

In addition to the items placed on Mr. Spackman's list, several machines in the basement were subjected to the flooding sewage water. Not one of these machines was new, most of them estimated to be between 3 and 5 years of age. One machine was, however, only a week in use. These machines were of the type which have a readily ascertainable market value—washing machines, dryers, vacuum cleaners—and such guide, based upon their value in a used condition upon the market nearest the place of their destruction or damage, is the guide which should have been employed by the jury in its determination of what compensatory payment was due the plaintiffs. The plaintiffs replaced their used machinery with new machines capable of performing the functions required by the motel at an expense of $2,575. The plaintiffs are not entitled to be paid money in compensation for new machines, but only for the value of the machines destroyed by the defendant's negligence. A haphazard guess at the value will not suffice. It is far better to establish the value of these machines according to the market value test, and then to adjust the value, if necessary, in accordance with good sense and fair compensation.

Since there must be a new trial we wish to comment that the jury was instructed that "in estimating damages, * * * the value of property to a buyer or owner thereof, deprived of its possession, is deemed to be the price at which he might have bought an equivalent thing in the market nearest to the place where the property ought to have been put into his possession * * *."

■ This instruction is based entirely upon R.C.M.1947, § 17-602, and we wish to point out that this statute is improperly applied to this case, even though the language used in the statute is suitable in part, if properly heeded and understood by the jury. Section 17-602, applies to the valuation of property transferred between buyer and seller—vendee and vendor. This is made abundantly clear by the fact that the statute was repealed by the legislature in 1963 to make way for enactment of the Uniform Commercial Code. Clearly, this tort-caused damage suit is not within the intended scope of that statute, even though the language used therein is, in part, a proper guide for the jury in its determination of the value of the property concerned. We feel that the jury was mislead by this instruction and that the meaning of "an equivalent thing" was lost to the jury. The verdict reflects such a result. We shall not discuss individually the instructions given or those refused but the foregoing observations will serve as a guide.

■ R.C.M.1947, § 93-5603, permits a new trial when the jury has returned excessive damages due to passion or prejudice. We will enlarge upon that so as to make our decision here more clear. The rule is that a verdict is presumed to be correct and just until it can be shown with reasonable conviction that the jury (1) violated the law; (2) gave way to passion, prejudice or partiality; (3) made a mistake of law or fact; (4) based its findings on a misundertasnding of law or fact, or; (5) acted carelessly or perversely. See 15 Am.Jur., "Damages," § 205; Damages to Persons and Property, Oleck, 1961 Ed. § 108, p. 145.

■ One further note in the area of compensatory dam-

ages relates to property which, because of its peculiar nature, has no market value. In such cases, reference can be made to the value placed upon such an item by its owner, so long as such valuation is not fanciful or unreasonable. Property within this category, for example, would be clothing, luggage, heirlooms, or portraits.

Finally we come to the matter of exemplary damages and the verdict of $20,000 exemplary damages in this case. R.C.M.1947, § 17-208, states:

"In any action for a breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant."

The amended complaint is grounded solely upon malice on the part of the defendant, and prayed for $25,000 damages.

R.C.M.1947, § 19-103 in part, states:

"18. The words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law."

The facts of this case do not show such wilful disregard of duty as to amount to malice sufficient to warrant the imposition of exemplary damages, but we are not to be understood here as construing R.C.M.1947, § 17-208, to be exclusive. And even had we not reached this decision, the sum of $20,000 under the circumstances is utterly fantastic. We have described above the efforts of the defendant's employees following the breaking of the pipes to insure the free passage of the water. There is not a shred of evidence of malice, or of such indifference as would permit the inference of malice. It is clear that the jury acted with passion and prejudice in this area of its determinations—perhaps through sympathy for the plaintiffs—perhaps because of the rather distasteful results of the defendant's negligence. But it should always be remem-

bered that exemplary damages are extraordinary in their nature and are used by way of punishment or by way of example only when the conduct of the defendant clearly shows that he is deserving of such special treatment. The plaintiff is never entitled to exemplary damages as a matter of right, regardless of the situation or the sufficiency of the facts. Gilham v. Devereaux, 67 Mont. 75, 76, 214 P. 606, 33 A.L.R. 381. In order to render one liable for exemplary damages something more than mere negligence must be alleged and proved. Thompson v. Shanley, 93 Mont. 235, 246, 17 P.2d 1085.

The district court should have granted the defendant's motion made at the close of all testimony in the case to withdraw and exclude the issue of exemplary damages from consideration of the jury, and failure to do so was error.

Upon retrial of course all instructions dealing with exemplary damages must not be given.

For these reasons the judgment is reversed and the cause is remanded to the district court with instructions to grant a new trial in accordance with the views expressed in this opinion. Each party shall bear their own costs on this appeal.

MR. JUSTICES ADAIR, DOYLE and CASTLES concur.

MR. JUSTICE JOHN C. HARRISON:

I concur with the result of the majority but disagree as to their finding in the matter of exemplary damages. It is my opinion that the defendant herein showed such a wilful disregard for the duty, not only to the plaintiff whose property was located nearby, but to the public in general, in not guarding and maintaining the ditch created to carry away the sewage. In my opinion it comes within our statute, section 17-208, and I would so hold.