No. 81-265

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

———————————

SHELDON CHANDLER and MARILYN
CHANDLER, husband and wife,

                         Plaintiffs and Respondents,

     vs.

ROBERT H. MADSEN,

                      Defendant and Appellant.

———————————

Appeal from:  District Court of the Thirteenth Judicial District,
             In and for the County of Yellowstone
             Honorable Robert Wilson, Judge presiding.

Counsel of Record:

    For Appellant:

        Hibbs, Sweeney, Colberg, Jensen and Koessler,
         Billings, Montana
        Maurice Colberg argued, Billings, Montana

    For Respondents:

        Crowley, Haughey, Hanson, Toole & Dietrich, Billings,
         Montana
        Bruce Toole argued, Billings, Montana

———————————

                     Submitted:  December 4, 1981

                      Decided:    MAR 15 1982

Filed MAR 15 1982

_Thomas J. Kearney._
                    Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This appeal arises from a complaint by Sheldon and Marilyn Chandler, husband and wife, against Robert Madsen, seeking damages for negligence, breach of implied warranty of habitability and strict liability in tort.

In April 1977, respondents, the Chandlers, entered into a buy-sell agreement with the appellant, Madsen, to purchase a house, built by him, at 3203 Silverwood Street near Billings, Montana. The agreed purchase price was $90,280, which was paid when the building was transferred. At the time of this agreement, the framework on the house was in place, but the building was not completed.

Madsen, a civil engineer working for the United States Government, had constructed a number of buildings for sale on his own, including single family residences.

In the summer and fall of 1977, the Chandlers completed the final landscaping of the lot and installed a swimming pool and sprinkling system.

In June 1977, the Chandlers moved into the house and immediately experienced problems with doors and windows sticking and locks failing to operate. The Chandlers noticed cracks in the bedroom walls and a hump in the living room floor which was above a supporting partition in the basement. Through his employees, Madsen made adjustments to the doors, but they continued to stick.

By May 1978, additional settling had caused severe cracks in most rooms of the house, bending and bulging of the floors, broken windows, inoperative doors and door locks, bowed decorative room dividers, bent plumbing, badly cracked basement walls and floors, separation between fire-

place masonry and the house structure, cracked bathroom tiles, separation between bathtubs and walls, uneven basement floors and general unsightly interior of the house. The settlement developed so that parts of the foundation on the west side of the house were as much as 3.6 inches lower than the foundation on the east side.

A depression extends along the north end of the lot in question in an east-west direction. The depression collects water periodically and has done so since before the Chandlers took possession of the house. Former next-door neighbors of the Chandler house testified via deposition that they had to refrain from watering their lawn to prevent "ponding" in the depression both during and after construction of the Chandler house and that water collected periodically in the depression before any landscaping was done. According to the landscaper, Jim Sturn, the only change in grade he made near the north end of the lot was the removal of some earth near the deck, which would have tended to improve drainage out of the depression.

Madsen testified he created a depression extending east and west to collect water and constructed a swale on the east side of the house to drain the area. The depression Madsen created was such that it would be difficult to observe with the naked eye. He did not use any survey instrument or transit to determine if in fact the area would drain, nor did he inform the Chandlers they should proceed to create drainage.

The house is located on moisture-sensitive soil which, when wet, becomes compressible. The presence of water in the soil caused settling of the footings, founda-

tions, and other parts of the house which in turn caused the extensive damage to the structure.

Testimony showed an estimated cost of repairing the house was $65,000. This estimate was calculated on a cost plus overhead basis with a 12% contingency allowance for certain portions of the work. Further testimony revealed, however, that a firm price contract for the repair would cost 50% more than the estimate, or $97,500, considering the contingencies of the work. The repairs would require the Chandlers to move out of their home for three to four months.

The case was heard by the District Court sitting without a jury. On January 15, 1981, the District Court issued findings of fact and conclusions of law holding Madsen liable to the Chandlers on the theories of implied warranty and negligence and awarding damages of $107,462.51. Following post-trial motions the District Court amended its order on February 26, 1981, deleting the finding of negligence and reducing the damage award to $99,975.00. The reduction deleted $4,000 previously awarded for temporary rental and $3,487.51 previously awarded for moving and storage. From this order, both parties appeal.

The issues before this Court are:

1. Whether appellant, as a builder-vendor of a residence which he sold to respondents, may be held liable to respondents under the doctrine of implied warranty of habitability?

2. Whether the District Court erred in not allowing appellant to recover the amount claimed on his counterclaim?

3. Whether the District Court erred in deleting its

finding that the appellant's negligence was the proximate cause of respondents' damages?

4. Whether appellant is liable under the doctrine of strict liability in tort?

5. Whether the District Court erred in the award of damages?


IMPLIED WARRANTY OF HABITABILITY

The question of the liability of a builder-vendor of a new residence to the first purchaser under an implied warranty of habitability is one of first impression before this Court.

Caveat emptor, which traditionally has applied to sales of real estate, developed at a time when a buyer and seller were in equal bargaining positions. They were of comparable skill and knowledge and each could protect himself in a transaction.

In the modern marketplace that equality of position no longer necessarily exists, and a growing number of jurisdictions have abandoned caveat emptor in favor of implied warranties where a builder-vendor sells a new residence. Yepsen v. Burgess (1974), 269 Or. 635, 525 P.2d 1019; Pollard v. Saxe & Yolles Development Co. (1974), 115 Cal.Rptr. 648, 12 Cal.3d 374, 525 P.2d 88; Hanavan v. Dye (1972), 4 Ill.App.3d 576, 281 N.E.2d 398; Bethlahmy v. Bechtel (1966), 91 Idaho 55, 415 P.2d 698; Carpenter v. Donohoe (1964), 154 Colo. 78, 388 P.2d 399.

We agree with the Oregon Supreme Court which stated in Yepsen that the essence of the transaction between a builder-vendor and a buyer is an implicit agreement that the

seller will transfer a house which is suitable for habitation. The buyer is not in an equal bargaining position and is essentially forced to rely on the seller's skill and knowledge regarding the habitability of the house. In addition, the builder is in a better position to examine and discover defects. Yepsen v. Burgess, 525 P.2d at 1022.

The doctrine of caveat emptor no longer serves the realities of the marketplace. Therefore, we hold that the builder-vendor of a new home impliedly warrants that the residence is constructed in a workmanlike manner and is suitable for habitation.

Madsen argues that even if the implied warranty of habitability is adopted, it should not apply in this case because the defect which caused the damage here is not structural but rather is inherent in the land.

In this claim, Madsen relies primarily on Beri, Inc. v. Salishan Properties, Inc. (1978), 282 Or. 569, 580 P.2d 173, where the plaintiffs leased buildings constructed by the defendant on oceanfront lots which subsequently began eroding. The Oregon court found an implied warranty did not apply because the defect--susceptibility to erosion--had solely to do with the inherent nature of the land and was not a product of the builder's work on the land.

In Beri, supra, the land in question was on the oceanfront where the prospect of erosion should have been, if not certain, at least equally as apparent to buyer-lessees as to seller-lessors. In addition, the Beri opinion gives no indication that the erosion was furthered by anything other than the natural action of the ocean.

That is not so in the present case. Here, the

District Court found the cause of settling damage to the Chandler house was the presence of water in the moisture-sensitive soil upon which the house was built. The fact of the moisture-sensitive soil was not the sole defect. The "pooling" of water at the north end of the house was also part of the defective condition. The District Court also found that, if water collected at the north end of the house, it did so before any landscaping by the Chandlers and was not caused by the Chandlers.

A basic concern in applying the implied warranty is whether the defect relates essentially to useful occupancy of the house. Mazurek v. Nielsen (1979), 42 Colo.App. 386, 599 P.2d 269; Yepsen, supra. Sometimes a defect is essential to occupancy but is not strictly structural. See: Yepsen, supra (defect involved improper construction of septic tank and drainfield); Tavares v. Horstman (Wyo. 1975), 542 P.2d 1275 (septic drainfield installed in gumbo clay so it would not drain); Forbes v. Mercado (1978), 283 Or. 291, 583 P.2d 552 (well water unusable because of high iron content).

Madsen argues he had no reason to suspect there was a moisture-sensitive soil which would cause settling. But that is not the issue. The concept here is not one of fault or wrong-doing but, rather, where one of two innocent parties will suffer, which was in the better position to prevent the harm?

Whether or not there was reason for Madsen to suspect the problem, as the builder-vendor he clearly was in the better position to prevent the problem. We, therefore, affirm the District Court regarding Madsen's liability under

-7-

the implied warranty.

## COUNTERCLAIM

Madsen counterclaimed for $637 which the Chandlers agree remained unpaid for specific "extras" completed by Madsen. The District Court concluded that Madsen was not entitled to the counterclaim because of failure of consideration. Madsen argues this conclusion was incorrect because the defense of failure of consideration was not alleged by the Chandlers as an affirmative defense or raised in their pretrial order and because there is no evidence that Madsen did not perform the work for those extras.

Failure of consideration is an affirmative defense which must be plead affirmatively. Rule 8(c), M.R.Civ.P. If an affirmative defense is not plead, it is generally waived. Camalier & Buckley-Madison, Inc. v. Madison Hotel, Inc. (D.C. Cir. 1975), 513 F.2d 407. The key to determining the sufficiency of the pleading of an affirmative defense is whether it gives fair notice of the defense. Wyshak v. City National Bank (9th Cir. 1979), 607 F.2d 824.

Here, the Chandlers did not specify their reliance on failure of consideration as a defense to Madsen's counter-claim either in the pleadings or their pretrial memorandum. Sheldon Chandler testified at trial that among the items purchased for the house in addition to those included in the purchase price were "extras" from Madsen. Chandler also testified that he had paid Madsen $1,500 and still owed $637. The evidence does not specify what "extras" were involved nor does it establish that those "extras" were not supplied.

-8-

We find the Chandlers' failure to plead failure of consideration here was fatal to that defense, and the District Court's conclusion is unsupported by the evidence.

NEGLIGENCE

In its original findings of fact and conclusions of law the District Court found that Madsen had a responsibility of providing drainage around the house to prevent damage to the house and that Madsen negligently failed to do so. Further, the District Court found Madsen's negligence caused or contributed to cause the water to enter the subsoil and the house to settle.

The amended findings and conclusions stated the Chandlers failed to carry their burden of proof that Madsen's negligence was the proximate cause of the damage. The Chandlers argue that given the District Court's finding that the most probable cause of the damage to the house was water under the footings, the only explanation is Madsen's conduct.

On review, the standard we must apply is whether the District Court's conclusion is supported by substantial credible evidence and the law. If so, this Court will not disturb it. Woodahl v. Matthews (1982), ___ Mont. ___, ___ P.2d ___, 39 St.Rep. 238; Lauterjung v. Johnson (1977), 175 Mont. 74, 572 P.2d 511.

Although our weighing of the facts might have resulted in a different conclusion, we find the District Court's findings and conclusions regarding negligence are supported by substantial evidence that the Chandlers failed to prove Madsen's negligence.

STRICT LIABILITY

Since we have determined liability here on the theory of implied warranty, we find it unnecessary to discuss the strict liability doctrine.

DAMAGES

Madsen claims the District Court's finding of the cost of repairs at $97,500 is punitive, speculative and unsupported by the evidence. He relies heavily in his claim on Spackman v. Ralph M. Parsons Co. (1966), 147 Mont. 500, 414 P.2d 918, in which the plaintiff sought damages resulting from sewage flooding to personal and real property. Madsen argues that Spackman forges a strict rule of law in Montana that the measure of damages is the cost of repair if the cost is less than the diminution in value of property but in no case will the recovery exceed the value of the property before injury.

Spackman does not set this principle out, however, as a hard-and-fast rule but, rather, as a guide to common sense:

> "Where damage to property is concerned, the purpose of awarding damages is to return the party injured to the same, or as nearly as possible the same, condition as he enjoyed before the injury to his property . . .

> "Ingenious men have propounded ingenious methods, systems and formulas for determining in monetary terms the value of property partially damaged or destroyed. While such methods serve as useful guides, the final answer must rest in good sense rather than mechanical application of such formulas." Spackman, 147 Mont. at 506, 414 P.2d at 921-922.

In Bos v. Dolajak (1975), 167 Mont. 1, 534 P.2d 1258, this Court recognized that the Spackman rule cannot always

clearly be applied. In Bos the defendants contracted with plaintiffs to erect for $6,500 a grain silo which plaintiffs had purchased secondhand but which was the equivalent of a new silo. Defendants secured the raised silo with fewer jacks than required by the construction manual and allowed the silo to twist so it could not readily be lowered. During the process, a windstorm threw the silo off its foundation and virtually destroyed it.

At trial plaintiffs presented damages totaling $25,274.61: $15,342.61 was the cost of replacing the silo and $9,932 cost from loss of use. The jury awarded $17,626.75.

This Court approved the determination of damages and noted that the Spackman rule dealt with readily replaceable items with an established market value. Where an item was not readily replaceable, did not have an established market value, and was integral to a larger operation such as the plaintiffs' dairy farm, this Court held that other considerations were appropriate including compensation for loss of use.

In the case before us, Claude Gerbase, a Billings contractor, testified that repair of the Chandler house would require drying out the subsoil, cutting the house loose from its foundation and bringing it to a level grade. Once the house was made level and secure, additional cosmetic and structural repairs would be required including replacement of sheetrock.

Gerbase testified his estimated cost of repair of the house was $65,000, which included a 12 percent contingency factor. He further testified that because of the

-11-

complicated and uncertain nature of the job he would charge $97,500 to enter into a fixed price contract for the repairs. The District Court awarded damages of $97,500.

Madsen argues the finding is punitive and contrary to law in part because the house was originally sold for less than the damage award. We disagree.

Madsen also claims that if he is liable for any damages the proper amount is $65,000 which was Gerbase's repair estimate. Madsen argues the $97,500 is speculative in that it was quoted by Gerbase as his fixed contract price only to guarantee he would lose no money on the job. We disagree.

An estimate, by its very nature, is speculative, particularly where, as here, the job is complicated and subject to revision as it progresses. It would be of questionable value to the Chandlers to receive $65,000 for repairs only to discover, once into the project, the cost would be significantly more. Given the nature of the damage to the Chandler home and the repairs required, we affirm the District Court's award for repairs.

The Chandlers argue that the District Court erred when it deleted the costs of temporary rental and moving and storage from the damage award.

The initial question in resolving this issue is whether a breach of an implied warranty arises out of a contract obligation or some other obligation. That determination will establish what damages are available as a result of breach. Sections 27-1-311 and 27-1-317, MCA.

In Ferguson v. Town Pump, Inc. (1978), 177 Mont. 122, 580 P.2d 915, this Court found an oral contract for

construction of gasoline station to carry with it an implied term that the work would be performed in a reasonably skillful and workmanlike manner. It also found that a negligent failure to perform according to the implied term resulted in a breach of contract as well as a tort. 177 Mont. at 131, 580 P.2d at 920.

Although here we do not have the negligence component which sustained the tort theory in Ferguson, we do have a breach of an implied term of the contract. Madsen's breach of implied warranty is a breach of contract and subject to the provisions of section 27-1-311, MCA. That provision sets the measure of damages for breach of an obligation arising from a contract as "the amount which will compensate the party aggrieved for all the detriment which was proximately caused thereby or in the ordinary course of things would be likely to result therefrom."

It is apparent that the necessity of moving from a residence undergoing massive repairs and of renting a temporary residence is likely to result from major damage to a structure. We, therefore, find that costs for moving and storage and temporary rental were improperly deleted from the damage award.

Marilyn Chandler testified she had obtained estimates from a Billings real estate office that a suitable temporary rental for the Chandlers would cost between $600 and $1,000 per month. She testified that she also had obtained an estimate of $3,487.51 for moving the Chandlers' furniture. In addition, Gerbase testified the Chandlers would be required to move from their house for three to four months during repairs.

Since the testimony establishes a $400-per-month disparity in rental figures, an award of the middle figure appears appropriate. Therefore, we award the Chandlers $3,200 ($800 per month for four months) for temporary rental and reinstate the award of $3,487.51 for moving and storage.

The Chandlers also argue the District Court erred in failing to grant damages for emotional distress. Since we have found no liability for negligence or strict liability, such damages need not be considered here.

SURPRISE

Madsen requests that a new trial be granted on the damage issue on the grounds he has been surprised under sections 25-11-102(3) and 25-11-103, MCA. This request is based on the affidavit of Madsen's attorney, which states that an extensive discussion with Claude Gerbase, had in lieu of deposition on December 6, 1980, indicated Gerbase's estimate for cost of repair would be $65,000. On December 9, 1980, at the request of Madsen's attorney, Gerbase submitted a detailed breakdown of the estimate. Subsequently, according to the affidavit, Madsen's attorney contacted another contractor who examined the documentary and video-taped evidence and concluded his estimate would not be significantly less than $65,000.

The Chandlers argue the claim of surprise is unfounded. In support of their position, the Chandlers refer to a letter of October 29, 1980, from their attorney to Madsen's attorney which stated: "Another item to take into account is that the Gerbase estimate is only that. It is not an agreement to restore the house. The Chandlers are

entitled to have their house restored and if a contractor requires an additional sum of money for contingencies, such as he would regularly charge in the course of his trade, then we will want to add that on."

In addition, Claude Gerbase, by affidavit, stated that according to his recollection of the December 6, 1980, meeting with the attorneys for both parties, he told all those present that he would not enter into a firm contract for the amount of his estimate.

Surprise has only once been accepted as the basis for granting a new trial in Montana. Porter v. Industrial Printing Co. (1901), 26 Mont. 170, 66 P. 839, modified, 67 P. 67. The Court found such surprise where the trial court had granted default against the plaintiff for failure to reply to the defendant's counterclaim. At trial the defendant presented no proof in support of its counterclaim. The Court later declared only three of the counterclaims stated causes of action and entered judgment for the plaintiff. This Court found surprise which "ordinary prudence could not have guarded against." Porter, 26 Mont. 182, 66 P. at 841.

We do not have such a situation here. We find there was sufficient reference to the fact a fixed-price contract would be different than the estimate and would be relied on by the Chandlers to preclude surprise.

This case is remanded to the District Court with instructions to amend its judgment in accordance with this opinion.

_____
Justice

-15-

We concur:

_____
Chief Justice

_____

_____
Justices

Mr. Justice John C. Sheehy, concurring specially:

I agree with the result here. I affirm the damages award of $97,500 for repair of the house because we are bound by the appellate rule that the findings of a district court may not be set aside unless clearly erroneous. Rule 52(a), M.R.Civ.P. A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. United States v. Gypsum Co. (1948), 333 U.S. 364, 394-395, 68 S.Ct. 525, 92 L.Ed. 746. I am pursuaded on this point by the evidence of the contractor that he would not enter into a firm contract for repair at the figure of $67,500. The burden of proof on the plaintiffs was by a preponderance of the evidence. The Gerbase evidence, being credible, is substantial and therefore it overcomes the "clearly erroneous" rule. See Western Cottonoil Co. v. Hodges (5th Cir. 1954), 218 F.2d 158.

_____
John C. Sheehy
                Justice