No. 95-557

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

BARBARA NITZEL, personal representative
of the estate of LLOYD ROBERT MCKAY,
deceased,

    Plaintiff, Counterdefendant and
    Respondent,

    v.

MARSHA WICKMAN, individually and as
sole surviving partner of M & M WALKERS
PARTNERSHIP, and M & M WALKERS
PARTNERSHIP,

    Defendants, Counterclaimants and
    Appellants.

APPEAL FROM:    District Court of the Ninth Judicial District,
        In and for the County of Pondera,
        The Honorable Marc G. Buyske, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

            David F. Stufft, Cut Bank, Montana

        For Respondents:

            K. Dale Schwanke, Jardine, Stephenson, Blewett & Weaver, Great Falls,
            Montana

**FILED**

Filed:    JUL 0 2    1997

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

_____
Clerk

Submitted on Briefs: June 19, 1997

Decided: July 2, 1997

Justice James C. Nelson delivered the Opinion of the Court.

Barbara Nitzel, as personal representative of the estate of Lloyd Robert McKay (Mac) brought this action seeking dissolution of the partnership known as M & M Walkers and an equal distribution of partnership assets. The District Court for the Ninth Judicial District, Pondera County, dissolved the partnership giving one half of all partnership assets to Mac's estate (the Estate) and one half to the surviving partner, Marsha Wickman (Marsha). Marsha appeals. We affirm.

We address the following issues on appeal:

1. Did the District Court err in ruling that the August 24, 1987 document is invalid as a contractual obligation between Mac and Marsha?

2. Did the District Court err by failing to address Marsha's arguments that the Estate was estopped from claiming that the August 24, 1987 document was not binding and enforceable?

**Factual and Procedural Background**

On August 18, 1986, Marsha and Mac formed M & M Walkers, an equal partnership. The purpose of the partnership was to breed, raise, train and market Tennessee Walking Horses. Marsha and Mac did not enter into a written partnership agreement. Instead, they had an oral agreement sealed with a handshake.

Marsha had raised Tennessee Walkers before and after the formation of the partnership, Marsha worked with the horses on a daily basis. She also maintained the books

and records of the partnership. Mac had a full-time job with an implement company and did not spend as much time working with the horses as did Marsha. Although Marsha and Mac agreed that Mac would only contribute money when he had the funds and contribute time when he was not at his fall-time job, they agreed that it would be an equal partnership.

On or about August 24, 1987, Mac executed a document wherein he purported to convey his interest in the partnership to Marsha in the event something happened to him. The document was prepared without the assistance of an attorney and stated as follows:

> I, Lloyd McKay am a partner in the M & M WALKER Horse business. If anything happens to me all the horses SUPREMES DESERT FAWN, SO SO SHADOW SIS, NAMRONS KO KO DELIGHT, SUPREMES ROYAL FLAME, AND ANY OTHER HORSES PURCHASED will belong to my partner Marsha Wickman. In the business also are my two hay trailers, my horse trailer, baler, my brown Ford three quarter ton pickup. They will stay in the business and belong to Marsha Wickman and anything else we purchase with the M & M Walker and or our names on it. There is numerous equipment that has been purchased and is in my garage, house, horse trailer etc. Halters, bridles, saddles, ropes, harness, pack saddle, pads, curry brushes, rubber tubs, water tubs, fencing, grain bin, cover blankets, feeders, saddle pads etc. and anything else purchased after the date of this paper August 24, 1987 will stay in the business and belong to Marsha Wickman.
> All the business records are kept at my house at 120 s. Minnesota. Marsha has access to my house to get anything pertaining to the business and what ever belongs to her as she has things stored in my spare room and garage. Description of trailers and any other machinery on attached sheets.

Marsha testified at trial that she typed the document at Mac's direction, leaving blanks for the insertion of a name where appropriate. The names "Lloyd McKay" and "Marsha Wickman" were written in by hand, purportedly by Mac. The document was signed by Mac and witnessed by Linda Duncan on September 2, 1987, and by Sandra Becker on September

3, 1987. It was subsequently notarized by Randy Wahl.

Mac passed away on June 25, 1992, without leaving a will or other testamentary disposition of his property. Mac and his wife, Sally, had divorced in 1985. They had two sons, Robert, who was killed in an automobile accident, and Tim. Mac had also adopted Sally's two daughters, Barbara and Vicky, sometime after Mac and Sally were married. When Mac and Sally divorced, Tim moved with his mother to Billings, the two girls having moved away several years earlier. Mac's family also included two sisters and three brothers. Mac's daughter, Barbara, was appointed personal representative of the Estate.

On October 21, 1992, Marsha, as sole surviving partner of M & M Walkers, and her husband, Terry, filed a creditor's claim against the Estate claiming that they were entitled to the return of property the Estate was allegedly wrongfully withholding from them. The Estate sent a notice of disallowance of claim on January 5, 1993. In addition, the Estate asserted a counterclaim against Marsha personally and as sole surviving partner, for an accounting from the partnership and for the Estate's share of the partnership's assets and profits. On April 5, 1993, the Estate sued Marsha alleging that the partnership had been dissolved by Mac's death, that the Estate was entitled to an accounting and distribution of an equal share of the partnership assets and profits, and that Marsha, in refusing to account for the partnership assets and profits, was appropriating them for her own benefit.

On September 10, 1993, Marsha filed an Answer and Counterclaim alleging that pursuant to the August 24, 1987 document, she was entitled to all partnership assets after

Mac died and that, as a result of the document, the Estate had no interest in the partnership or its assets. The counterclaim asserted that Marsha, Terry and the partnership were entitled to the immediate possession of property that was allegedly wrongfully withheld, and demanded its return and damages. Terry, who had not been named as a party defendant, was subsequently dismissed as a counterclaimant.

The District Court heard testimony on December 14, 15, 16 and 24, 1994. A considerable amount of testimony at trial dealt with the extent of Marsha's relationship with Mac as well as the quality of the relationship Mac's family, particularly Tim, maintained with Mac. It was alleged during trial that Mac and Sally's divorce was a result of Mac's relationship with Marsha.

On November 7, 1995, the District Court entered its Findings of Fact, Conclusions of Law, Order and Judgment concluding that, as a matter of law, the written agreement was invalid because of a lack of consideration. Additionally, the court concluded that the document did not meet the legal requirements necessary to suffice as a testamentary disposition of property even though it had not been offered as such. The court determined that the Estate was entitled to one-half of the value of the partnership's assets, less any obligations due, as of June 25, 1992, the date of Mac's death. Hence, the court ordered Marsha to provide the Estate with a fall accounting of all partnership assets and liabilities as of that date, as well as any income received or expenses incurred subsequent to that date. Marsha appeals the District Court's judgment and order.

Issue 1.

Did the District Court err in ruling that the August 24, 1987 document is invalid as a contractual obligation between Mac and Marsha?

In its November 7, 1995 Findings of Fact, Conclusions of Law, Order and Judgment, the District Court concluded that Marsha was under a legal obligation to contribute to M & M Walkers, consequently, her "promise" to continue to contribute to the partnership in return for the August 24, 1987 document was insufficient consideration. The court, finding no evidence of any other consideration, concluded that the agreement was invalid as a contractual obligation between Mac and Marsha.

The standard of review of a district court's conclusions of law is whether the court's interpretation of the law is correct. Carbon County v. Union Reserve Coal Co., Inc. (1995), 271 Mont. 459,469, 898 P.2d 680,686 (citing Steer Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601,603).

The Estate argues that the District Court erroneously concluded that Marsha "promised" to continue to contribute to the partnership in return for the August 24, 1987 document. We find no evidence in the record that Marsha made any type of "promise," only that she voiced an unwillingness to continue to contribute to the partnership.

The August 24, 1987 document does not recite any consideration for the contemplated transfer. However, Marsha contends that the fact that she did not dissolve the partnership was sufficient consideration to make the document a binding and enforceable contract. In addition, she maintains that she refused to put any additional time or money into the

partnership unless she was assured of some protection from Mac's family and that is why Mac had her prepare the document for his signature,

A valid contract must be supported by sufficient consideration. Section 28-2-102, MCA. "Consideration" is defined at § 28-2-801, MCA, as:

> Any benefit conferred or agreed to be conferred upon the promisor by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor is a good consideration for a promise.

"A written instrument is presumptive evidence of a consideration." Section 28-2-804, MCA. However, this presumption of consideration is rebuttable and the burden of showing a want of consideration sufficient to support an instrument lies with the party seeking to invalidate the instrument. Section 28-2-805, MCA.

Marsha contends that Mac benefitted from his promise to convey to Marsha because Marsha agreed to continue funding the partnership. However, Montana law in effect at the time the partnership was formed, as well as when the August 24, 1987 document was signed, required that partners contribute to a partnership in accordance with the partner's share of profits. Section 35-10-401(1), MCA (1985). Thus, Marsha's "promise" to perform her existing legal obligation of funding the partnership was not sufficient consideration for the document. Section 28-2-801, MCA; Rudio v. Yellowstone Merchandising Corp. (1982), 200 Mont. 537, 543-44, 652 P.2d 1163, 1167.

Marsha also contends that because she had the right to dissolve the partnership but

7

elected not to, such forbearance furnished sufficient consideration to support the document. We stated in <u>Rudio</u> that forbearance to enforce a legal right is sufficient consideration to support a contract *if there is an agreement to forbear.* <u>Rudio</u>, 652 P.2d at 1167. Thus, if Marsha had specifically agreed not to dissolve the partnership in return for the August 24, 1987 document, her agreement would constitute sufficient consideration. However, there is no evidence in the record that she made such an agreement. On the contrary, Marsha's testimony at tial indicated that she did not make any agreements in exchange for Mac's signing the document:

> Q. [Mac] did as you to agree to do something in return for this document did he?
> A. 'No.
> Q. It's just something that he wanted to do, is it not?
> A. I believe it was something that he wanted to do. I think he wanted to protect me.
>
> Q. And he did not ask that you sign a similar agreement?
> A. No.
> Q. Was your answer, No, he didn't ask you to do a similar agreement?
> A. No, he didn't ask me to do anything, no.

Trial Transcript pp. 694-97.

Moreover, the record does not indicate that Mac executed the document because of any promise to forbear from Marsha:

> Q. Now did Mac approach you about doing something with respect to this document you call an agreement or did you approach him?
> A. He approached me at first.
> Q. All right, so you're saying that he came and spoke with you first about making out some sort of document?
> A. Yes, he was--

Q. I'm just asking you if he approached you first.

A. Yes.

Q. How long, before the document was signed, was that?

A. I don't know exactly, within a couple of months, within that time frame. I don't know exactly the date.

Q. Do you recall testifying at your deposition that it was about a month before the agreement was signed--the document was signed?

A. Yes, between a month, two months, somewhere in there, in that neck of the woods.

Q. So he was the initiating factor, according to your testimony; correct?

A. Yes, initially.

Q. And when he first talked with you then, you had not said anything to him about being concerned about the amount of money you were putting into the agreement; correct--into the partnership; correct?

A. This is at the first time he talked to me?

Q. Yes.

A. The first time he talked to me, he just mentioned the fact that he was concerned--

Q. I'm just asking you if you men--if you had not mentioned to him yet, the concern?

A. No, not at that time.

Q. All right.

A. Not at that particular time, no.

Q. So his thought process, in coming to you about this document, at least at that point, had nothing to do with any input from you as to your concern about the money you were putting into the partnership; correct?

A. At that particular time.

Q. Hadn't even come up in the discussions; right?

A. No, hadn't really talked about that, at that time.

Trial Transcript, pp. 690-92.

Accordingly, finding no evidence of a promise to forbear on Marsha's part, or anything else that might constitute sufficient consideration, we affirm the District Court's conclusion that the August 24, 1997 document was invalid as a contractual obligation between Mac and Marsha.

**Did the District Court err by failing to address Marsha's arguments that the Estate was estopped from claiming that the August 24, 1987 document was not binding and enforceable?**

Marsha contends on appeal that both promissory estoppel and equitable estoppel prohibit the Estate from claiming that the August 24, 1987 document is invalid. She maintains that the District Court erred by failing to address these issues in its Findings of Fact, Conclusions of Law, Order and Judgment. The Estate contends that since Marsha did not affirmatively plead either promissory estoppel or equitable estoppel, pursuant to Rule 8(c), M.R.Civ.P., she cannot now rely on those arguments. Moreover, the Estate argues that at no time during trial did Marsha or the partnership relate that they intended to rely upon any estoppel issue or theory and, instead, the first reference to estoppel was made in a paragraph in Marsha's proposed findings of fact and conclusions of law entered after trial.

Rule 8(c), M.R.Civ.P., provides:

> **Affirmative defenses.** In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, *estoppel,* failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation. [Emphasis added.]

"An affirmative defense is generally waived if not set forth affirmatively." Nimmick v. Hart (1991), 248 Mont. 1, 8, 808 P.2d 481, 486; Pracht v. Rollins (1989), 239 Mont. 62, 68, 779

P.2d 57, 61; Chandler v. Madsen (1982), 197 Mont. 234, 241, 642 P.2d 1028, 1032.

Marsha concedes that she did not include the affirmative defenses of promissory estoppel or equitable estoppel in her answer, but that she did raise these issues in her trial brief. She argues that Rule 15(b), M.R.Civ.P., allows her to rely on those defenses because the Estate impliedly consented to an estoppel defense at trial. Rule 15(b), M.R.Civ.P., provides, in part:

> **Amendments to conform to the evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues.

A review of the record indicates that Marsha did indeed raise estoppel issues in her trial brief filed with the District Court on December 14, 1994, and again in her Proposed Findings of Fact, Conclusions of Law and Judgment filed April 7, 1995. However, there is no indication in the record that these issues were tried either by express or implied consent. Moreover, Rule 15(b) requires the filing of a motion to amend the pleadings and Marsha has never filed a motion to amend her answer to include the affirmative defenses of promissory estoppel or equitable estoppel. "In order to amend a pleading under Rule 15(a) or Rule 15(b), M.R.Civ.P., a party must tile an appropriate motion, and brief accompanying that motion." Nimmick, 808 P.2d at 487.

We will not address issues which were not properly raised before the district court.

11

Marsh v. Overland (1995), 274 Mont. 21, 29, 905 P.2d 1088, 1093 (citing Lane v. Smith (1992), 255 Mont. 218, 221, 841 P.2d 1143, 1145). Accordingly, we conclude that Marsha failed to timely raise the defenses of promissory estoppel and equitable estoppel before the District Court and, therefore, we decline to address these issues.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

12

Justice Ten-y N. Trieweiler dissenting in part and specially concurring in part

I dissent from the majority opinion.

I do not quarrel with the majority's statement of the law applicable to this case. I do conclude that it is incomplete and that the majority's interpretation of the record is incorrect.

Section 35-10-603(1)(b), MCA (1987), which was in effect at the time Lloyd and Marsha entered into their agreement, provided as follows:

Dissolution is caused, without violation of the agreement between the partners by:
. . .
(b) . The express will of any partner when no definite term or particular undertaking is specified.

In other words, because there was no specified term for this partnership, Marsha could have terminated the partnership agreement at any time.

The majority correctly notes, as we stated in *Rudio v. Yellowstone Merchandising* (1982), 200 Mont. 537, 543-44, 652 P.2d 1163, 1167, that a promise by Marsha to forebear her right to terminate the partnership would have been sufficient consideration for Lloyd's agreement to leave his partnership interest to her at the time of his death. However, the majority then concludes that there was no evidence of such a promise in the testimony. I disagree.

Marsha gave the following testimony at trial:

Q.     Let me jump ahead a little bit, Marsha, and I'll get back to some of these exhibits. Did there come a time when you became concerned regarding the amount of monies you were investing in the partnership?

13

A.    Yes.

Q.    Okay, and you talked with Mac about this?

A.    Yes, briefly.

Q.    Okay, what was your concern?

A.    Well, my concern was that his family was giving him quite a bit of trouble, and I was not going to put anymore [sic] money into the business, at that  time.

Q.    Was Mac aware of that?

A.    Yes, he was.

Q.    And so what happened?

A.    Well, to start with, Mac was a little bit concerned about his family and he wanted to protect me, and to start with, I told him, that I didn't believe -- actually I told him his handshake was good enough for me. And his concerns became more and more, and as his concerns became more and more --

Q.    Did you -- I'm going to speed some of this up. Did you discuss with Mac, regarding what your intent was to do with the business?

A.    Yes, I was just getting to that now.

Q.    And what was your discussion?

A.    We were taking down -- going down to the horses and I told him that I was not going to put anymore [sic] money into the business, and that there wasn't going to be a business.  I was going to get out if he didn't do something to protect me. and -- some kind of an agreement or something because there was not going to be a business after '87.

Q.    Okay, and did you -- was an agreement finally then signed by Lloyd McKay?

A.    Yes.

14

(Tr.   647-48)

Q.      Marsha, would you have continued on with your contributions to the partnership, if that agreement had not been signed by Mac?

A.      No, I would not.
(Tr. 652)

THE COURT: So the question you're asking is, up to the time Mr. McKay signed the agreement, had Mrs. Wickman discussed with him the fact that she would not be making anymore [sic] contributions to the partnership unless such an agreement was signed.

MR. SCHWANKE: That's my question.

A.      I -- we did have a conversation, yes. We did not have a discussion. To me, a discussion is quite lengthy. The conversation we had was about a 30 second conversation and I told him I was not going to put anymore [sic] money into the partnership unless we had some kind of an agreement that was going to protect me, and otherwise I was done, I was out.

Q.      When did you tell him this?

A.      It was sometime -- oh, just a few weeks, probably, before the initial agreement.
(Tr.   697-98)

(Emphasis added.)

There is only one interpretation that can be attached to the testimony which is quoted.

Marsha Wickman was aware of her right to terminate her partnership with Lloyd McKay.

She was aware that without some protection of her future interest it was not financially

15

reasonable for her to continue to invest in the partnership; but she agreed to forebear from terminating the partnership based on the agreement that was signed by McKay and which is the subject of the Court's opinion. There was no evidence to the contrary. I conclude that the above testimony was direct evidence of a promise to forebear on Marsha's part and did provide sufficient consideration for the agreement entered into between her and Lloyd McKay on August 24, 1997.

For these reasons, I dissent from that part of the majority opinion which affirms the District Court's refusal to enforce the agreement between the parties. I concur with those parts of the majority opinion which relate to promissory and collateral estoppel.

_____
Justice

Justice William E. Hunt, Sr., and Justice Jim Regnier join in the foregoing dissenting and concurring opinion.

_____

_____
Justices

16